## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**GREGG COSTIN; DANIEL SCHULTZ; CASSIDY HOLLOWELL; NATHANIEL STEELE; ZACHARY AMIGONE; THOMAS HANDYSIDE; BOGDAN MATUSZYNSKI; DANIEL JACKSON; LIONEL KLEIN; and TANYA MURRIETA**

      *Plaintiffs*,

v.

**JOSEPH R. BIDEN, in his official capacity as President of the United States,**
The White House
1600 Pennsylvania Ave NW, 1ˢᵗ Floor, West Wing
Washington, D.C. 20500;

**LLOYD AUSTIN, in his official capacity as Secretary of the Department of Defense**
1000 Defense Pentagon, Room 3E880
Washington, D.C. 20301;

      *Defendants.*

Civil Action No.: 1:21-cv-2484

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

JURY TRIAL DEMANDED

## INTRODUCTION

"A sacred respect for the constitutional law is the vital principle, the sustaining energy of a free government."[1] In our nation's history there exists a time that our government prioritized expanding power and vesting it in its people; a principle that differs in stark contrast to the authoritarian grip within which we now live.

While it is with regret that our President's abject derelict of duty and callous disregard for the laws of this nation have compelled this action, it is not without surprise. Americans have

---

[1] Alexander Hamilton, Tully No. III, (Aug. 28, 1794).

remained idle for far too long as our nation's elected officials continue to satisfy their voracious appetites for power while neglecting to uphold and defend the Constitution and preserve the values upon which this nation was founded. Indeed, the forty-seven (47) year subjugation to our Commander-in-Chief's vapid political career our nation has endured leaves little remain uncertain–with more power, comes greater destitution.

This action seeks redress from Executive Order No.'s 14042 and 14043 (collectively, "Executive Orders") issued by President Biden on September 9, 2021, and an order ("DoD Order") issued by Department of Defense Secretary Lloyd Austin (collectively, Vaccine Mandates") and the unlawful, manipulative, coercive, and deceptive tactics Defendants have employed and continue to employ to facilitate the mass vaccination of all active-duty service members, federal contractors, and federal employees.

This action for declaratory and injunctive relief challenges the Biden Administration's derisorily claim that the Vaccine Mandates are constitutional and asserts claims pursuant to the Administrative Procedures Act, 5 U.S.C. § 706(2)(A) ("APA"), the Religious Freedom and Restoration Act, 42 U.S.C. § 2000bbb, *et seq.,* ("RFRA"), the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3 *et seq.* ("FDCA"), as well as the Free Exercise and Establishment Clauses of the First Amendment and Due Process and Equal Protection Clauses of the Fifth Amendment of the U.S. Constitution.

## PARTIES

### I.    PLAINTIFFS

1.      Plaintiff Bogdan Matuszynski is adult resident of California serves as a Border Patrol Agent for the U.S. Department of Homeland Security, Customs and Border Protection. Agent Matuszynski is a proud, first-generation Polish-Mexican-American and his service to country is largely inspired by his father, who defected from an oppressive, communist, regime in

pursuit of freedom and the ability to act, speak, and care for oneself–all of which the United States of America provided.  Agent Matuszynski's father legally immigrated to the United States in 1985 and his Within the scope of his employment, Agent Matuszynski routinely comes into close proximity with aliens unlawfully present in the United States. On or about January 6, 2021, Agent Matuszynski was exposed to COVID-19 while on duty and subsequently received a positive COVID-19 diagnosis. Due to this diagnosis, Agent Matuszynski developed severe, life threatening sequalae, including without limitation: Cardiomyopathy, Paroxysmal Supraventricular Tachycardia, Hemicrania, Sinus Tachycardia, Post COVID-19 Pneumonia, and Post COVID-19 Vertigo. Agent Matuszynski is also a devout Roman Catholic who cannot in morality receive the vaccine without compromising his closely held religious beliefs.

2.　　　Plaintiff Daniel Jackson ("Mr. Jackson") is an adult resident of the State of Florida and a Foreign Services Officer employed by the Department of State. Officer Jackson is a devout Christian and led worship for approximately 1,500 Christians as a Deacon at Beijing International Christian Fellowship throughout his State Department assignment to Beijing. Mr. Jackson would still be serving in this capacity but-for the conclusion of his assignment, at which time he returned to the United States approximately three (3) weeks ago. As a Christian, Mr. Jackson cannot in morality receive the vaccine without compromising his closely held religious beliefs. Specifically, Mr. Jackson's religious beliefs require him to refuse a medical intervention, including a vaccination, if his informed conscience comes to this sure judgment. Mr. Jackson's faith also instructs him that vaccination is not morally obligatory in principle and therefore must be voluntary; that there is a general moral duty to refuse the use of medical products, including certain vaccines, that are produced using human cells lines derived from direct abortions; that her informed judgments about the proportionality of medical interventions are to be respected; that he

3

is morally required to obey his sure conscience; and that abortion is a sin and contrary to the teachings of the Christian Church and as a Christian, he may invoke the Churches teaching to refuse a vaccine developed or produced with the use abortion-derived cell lines.

3.      Plaintiff Lionel Klein ("Special Agent Klein") is an adult resident of the State of New York and employed by the U.S. Secret Service. On or about September 8, 2021, Special Agent Klein was diagnosed with COVID-19. Special Agent Klein has antibodies making him naturally immune to coronavirus.

4.      Plaintiff Tanya Murrieta ("Ms. Murrieta") is an adult of the State of California and serves as an Emergency Medical Technician for Loyal Source Government Services, a federal contractor within the meaning of E.O. 14042. On or about January 16, 2021, Ms. Murrieta contracted COVID-19 and shortly thereafter, Ms. Murrieta suffered a stroke as a direct and proximate result. Ms. Murrieta also has an extensive history of severe, anaphylactic episodes. Ms. Murrieta's anaphylactic condition, which is triggered by *inter alia* the preservative(s) in medications or vaccines, is so severe even an antihistamine itself has hospitalized Ms. Murrieta due to the anaphylactic episode it triggered.

5.      Plaintiff Major Daniel Schultz ("Maj. Schultz") is an adult resident of the State of Florida and an active-duty member of the United States Air Force. Maj. Schultz's physician has determined Maj. Schultz is medically exempt from receiving any COVID-19 vaccination.

6.      Plaintiff Captain Gregg Costin ("Cpt. Costin") is an adult resident of the State of Georgia and an active-duty member of the United States Air Force. Cpt. Costin is a devout Christian cannot in morality receive the vaccine without compromising his closely held religious beliefs. Specifically, Cpt. Costin's religious beliefs require him to refuse a medical intervention, including a vaccination, if his informed conscience comes to this sure judgment. Cpt. Costin's

faith also instructs him that vaccination is not morally obligatory in principle and therefore must be voluntary; that there is a general moral duty to refuse the use of medical products, including certain vaccines, that are produced using human cells lines derived from direct abortions; that his informed judgments about the proportionality of medical interventions are to be respected; that he is morally required to obey his sure conscience; and that abortion is a sin and contrary to the teachings of the Christian Church and as a Christian, he may invoke the Churches teaching to refuse a vaccine developed or produced with the use abortion-derived cell lines.

7.      Plaintiff Cassidy Hollowell ("2d Lt. Hollowell") is an active-duty member of the United States Air Force. 2d Lt. Hollowell has SARS-CoV-2 antibodies and is naturally immune to coronavirus.

8.      Plaintiff Nathaniel Steele ("Capt. Steele") is an adult resident of the State of Florida and is an active-duty member of the United States Air Force.

9.      Plaintiff Zachary Amigone ("Mr. Amigone") is an adult reside of the State of New York and an employee of 3M Company, a federal contractor within the meaning of E.O. 14042. Mr. Amigone has a personal and family history of severe vaccine reactions and has been determined to be medically exempt from vaccination by a licensed physician.

10.      Plaintiff Thomas Handyside ("Mr. Handyside") is an adult resident of the State of Illinois and an employee of Medline Industries, Inc., a federal contractor within the meaning of E.O. 14042. Mr. Handyside is a devout Christian cannot in morality receive the vaccine without compromising his closely held religious beliefs. Specifically, Mr. Handyside's religious beliefs require him to refuse a medical intervention, including a vaccination, if his informed conscience comes to this sure judgment. Mr. Handyside's faith also instructs him that vaccination is not morally obligatory in principle and therefore must be voluntary; that there is a general moral duty

to refuse the use of medical products, including certain vaccines, that are produced using human cells lines derived from direct abortions; that his informed judgments about the proportionality of medical interventions are to be respected; that he is morally required to obey his sure conscience; and that abortion is a sin and contrary to the teachings of the Christian Church and as a Christian, he may invoke the Churches teaching to refuse a vaccine developed or produced with the use abortion-derived cell lines. Unlike many, Mr. Handyside is fortunate to have an empathetic employer who understands his faith and not only the legal requirement to abide by a religious exemption, but also, that permitting someone to practice their faith without question is simply a common courtesy and respect of human decency. Nevertheless, and despite his employer's wishes to permit Mr. Handyside to remain exempt from vaccination, Defendants have left Mr. Handyside's employer no other option than invade the spiritual realm of Mr. Handyside's life. Mr. Handyside has also tested positive for the SARS-CoV-2 Ab, Nucleocapsid; Non LCA Req antibodies as recent as September 21, 2021, and is therefore naturally immune to coronavirus.

## II.  DEFENDANTS

11.     Defendant Joseph R. Biden is the President of the United States, and he is sued in his official capacity. On or about September 9, 2021, President Biden issued Executive Order No.'s 14042 and 14043 which *inter alia* operate as a blanket vaccination mandate for all federal employees and federal contractors.

12.     Defendant Lloyd Austin is the Secretary of the Department of Defense ("DoD") and he is sued in his official capacity. On or about August 24, 2021, Secretary Austin issued a DoD Order that operates as a blanket vaccination mandate for all active-duty service members. In that capacity, Defendant Austin is responsible for supervising the branches of the U.S. Armed Forces; for promulgating, implementing, and enforcing the policies and regulations that govern

military service in all branches of the U.S. Armed Services and Departments, including the Department of the Army, Department of the Navy,[2] and Department of the Air Force;[3] and for ensuring the legality of these policies and regulations. In this role, he is responsible for the maintenance and enforcement of the Departments of the Military, including all policies and regulations related to the Mandatory Coronavirus Disease 2019 Vaccination of the Department of Defense Service Members Memorandum.

## JURISDICTION & VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a).

14.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district and a substantial part of the events, acts, or omissions giving rise to this action occurred in this district.

## STATEMENT OF FACTS

15.     On or about December 5, 2020, President Joseph R. Biden responded to a question about whether vaccines should be mandatory, stating:

> No. I don't think they should be mandatory, and I wouldn't demand them to be mandatory and I would do everything in my power. [sic] Just like I don't think masks have to be made mandatory nationwide. [4]

16.     By the spring of 2020, COVID-19 had spread across the globe. Since then, and because of the federal government's "Operation Warp Speed," three (3) separate coronavirus

---

[2] The Department of the Navy has jurisdiction over the United States Marines Corps.
[3] The Department of the Air Force has jurisdiction over the United States Air Force and United States Space Force.
[4] Joseph R. Biden III, *Vaccine Mandate Flip-Flop! Biden, Fauci, Pelosi Opposed Mandates*, THE JIMMY DORE SHOW (September 17, 2021) https://www.youtube.com/watch?v=kq1WuFuglz0&t=62s (last visited September 22, 2021)

vaccines were developed and made available to the public in the fastest vaccine production in history.

## A.     PFIZER'S COMIRNATY® & PFIZER-BIONTECH VACCINES.

17.     On August 23, 2021, the FDA approved Pfizer's COMIRNATY® (COVID-19 vaccine, mRNA) ("COMIRNATY"), which is legally distinguishable from the BioNTech vaccine as evidenced by the FDA's COMIRNATY approval announcement published on August 23, 2021.

18.     The approval announcement posted on the FDA's website reads, "On August 23, 2021, the FDA approved the first COVID-19 vaccine. The vaccine has been known as the Pfizer-BioNTech COVID-19 Vaccine, and will now be marketed as COMIRNATY, for the prevention of COVID-19 disease in individuals 16 years of age and older."[5]



19.     As you can see in the above graph, 0.45mg of the 2.25mg (20%) of ingredients contained in a COMIRNATY vial has been sanitized.

---

[5] The Food and Drug Administration, *Vaccine Information Fact Sheet for Recipients and Caregivers about COMIRNATY (COVID-19 Vaccine, mRNA) and Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19)* (Aug. 23, 2021), available at: https://www.fda.gov/media/144414/download

20.     While Pfizer's COMIRNATY approval letter states that its two vaccines share the same formulation, the FDA concedes that "the products are **legally distinct** with *certain differences* . . ." *Id.* (emphasis added).

21.     To date, no entity has revealed, nor have Plaintiffs been able to obtain, any evidence indicating what those "certain differences" may be. Despite this, the FDA asserts that the two formulations can be used interchangeably.

22.     For example, in the FDA's fact sheet[6] for recipients and caregivers, for example, it reads, "The FDA-approved COMIRNATY (COVID-19 Vaccine, mRNA) and the FDA-authorized Pfizer-BioNTech COVID-19 Vaccine under Emergency Use Authorization (EUA) have the same formulation and can be used interchangeably to provide the COVID-19 vaccination series."

23.     In a press release[7] announcing Pfizer's collaboration with Brazil's Eurofarma to manufacture COVID-19 vaccine doses, Pfizer wrote, "COMIRNATY® (COVID-19 Vaccine, mRNA) is an FDA-approved COVID-19 vaccine made by Pfizer for BioNTech" and "Pfizer-BioNTech COVID-19 Vaccine has received EUA from FDA." The press release continued, stating, "This emergency use of the product has not been approved or licensed by FDA, but has been authorized by FDA under an Emergency Use Authorization (EUA) to prevent Coronavirus Disease 2019 (COVID-19) . . .". *Id.*

24.     Then, in a September 6, 2021 press release[8] announcing a submittal to a request by the European Medicines Agency (EMA) to update its Conditional Marketing Authorization

---

[6] The Food and Drug Administration, *Vaccine Information Fact Sheet for Recipients and Caregivers about COMIRNATY (COVID-19 Vaccine, mRNA) and Pfizer-BioNTech COVID-19 Vaccine to Prevent Coronavirus Disease 2019 (COVID-19)* (Aug. 23, 2021), available at: https://www.fda.gov/media/144414/download; *see* Exhibit 7.

[7] Pfizer, *Pfizer and BioNTech Announce Collaboration with Brazil's Eurofarma to Manufacture COVID-19 Vaccine Doses for Latin America* (Aug. 26, 2021), available at: https://www.pfizer.com/news/press-release/press-release-detail/pfizer-and-biontech-announce-collaboration-brazils; *see* Exhibit 9.

[8] Press Release, *Pfizer and BioNTech Submit a Variation to EMA with the Data in Support of a Booster Dose of COMIRNATY®*, BIONTECH (Sept. 6, 2021), available at: https://investors.biontech.de/node/10581/pdf; *see* Exhibit 9.

(CMA) for a booster dose, BioNTech–Pfizer's co-partner in the production of the Pfizer-BioNTech COVID-19 vaccine–clearly states, "The Pfizer-BioNTech COVID-19 vaccine has not been approved or licensed by the U.S. Food and Drug Administration (FDA), but has been authorized for emergency use by FDA under an Emergency Use Authorization (EUA) to prevent Coronavirus Disease 2019 (COVID-19) . . .". *Id.*

25.     The product's labeling is even indicative that the vaccines are distinguishable. In a letter addressed to Pfizer, the FDA stated, "The Pfizer-BioNTech COVID-19 Vaccine vial label and carton labels are clearly marked for 'Emergency Use Authorization.'"[9]

26.     Mindful of this new marketing change, the FDA included specific language in its August 23 letter to Pfizer distinguishing the two vaccines, stating "the licensed vaccine (COMIRNATY) has the same formulation as the EUA-authorized vaccine (Pfizer-BioNTech) and the products can be used interchangeably to provide the vaccination series without presenting any safety or effectiveness concerns." *Id.* This is not true.

27.     According to the CDC, "the FDA approved the licensure of COMIRNATY (COVID-19 Vaccine, mRNA), made by Pfizer for BioNTech."[10] The ***FDA did not approve*** the Pfizer-BioNTech vaccine. Despite full knowledge that the BioNTech vaccine is not FDA-approved, the CDC nevertheless stated that, because "[t]he FDA-approved Pfizer-BioNTech product COMIRNATY and the FDA-authorized Pfizer-BioNTech COVID-19 vaccine have the same formulation[,] [the two vaccines] can be used interchangeably to provide the COVID-19 vaccination series . . .". As a result, the CDC has advised:

---

[9] Food and Drug Administration, Pfizer-BioNTech COVID-19 EUA LOA reissued August 23, 2021, (Aug. 23, 2021), available at: https://www.fda.gov/media/150386/download; *see* Exhibit 5.

[10] Centers for Disease Control and Prevention, *Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States*, (last visited Sept. 15, 2021), available at: https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html; *see* Exhibit 9.

[V]accination providers can use doses distributed under EUA [(e.g., the non-FDA approved Pfizer-BioNTech vaccine)] to administer the vaccination series as if the doses were the licensed vaccine.[11]

28.     The CDC is wrong.  The EUA statute, 21 U.S.C. § 360bbb-3, explicitly states that anyone to whom an EUA product is administered **must be informed of the option to accept or to refuse it**, as well as alternatives to the product and the risks and benefits of receiving it.

29.     The CDC's erroneous assertion that "vaccination providers can use doses distributed under EUA to administer the vaccination series as if the doses were the licensed vaccine" fails to appreciate perhaps the most consequential difference between COMIRNATY and BioNTech: **their current availability**.

30.     The FDA's COMIRNATY approval letter facially states, the CDC: (1) explicitly distinguishes the COMIRNATY and BioNTech vaccines; (2) expressly distinguishes that COMIRTNATY is approved and BioNTech is not FDA-approved but under EUA; (3) asserts that COMIRNATY and BioNTech have the same "formulation"; (4) alleges that BioNTech can be used interchangeably with COMIRNATY despite "certain differences" existing between the two different vaccines; and then with abject audacity, advises that "**[a]lthough COMIRNATY is approved** . . . **there is not sufficient approved vaccine available for distribution** to this population in its entirety at the time of reissuance of [the BioNTech] EUA." *Id.*

31.     In unequivocal terms, the FDA has made it expressly clear: "There is no adequate, approved, and available alternative **to the emergency use** of [the BioNTech] COVID-19 Vaccine to prevent COVID-19." *Id.*

32.     The only vaccine that has received FDA approval is COMIRNATY, yet COMIRNATY is unavailable. Thus, there is no FDA-approved vaccine that can be administered,

---

[11] *Id.*

and the administration of any non-FDA approved COVID-19 vaccine facially violates Secretary Austin's Order and President Biden's E.O. 14042 and 14043 ("Executive Orders") (all three collectively, "Vaccine Mandates").

33.     Any directive from a government official that compels vaccination from a non-FDA approved vaccine is unlawful *per se* and impacts approximately 1.3 million active-duty service members and roughly 98 million American citizens. The unlawful Vaccine Mandates and subsequent promulgations thereof by Defendants compel through duress or deception, that Plaintiffs and the dozens of similarly situated service members, federal employees, and federal contractors, inject themselves with: (1) a non-FDA approved product; (2) against their will; and (3) without informed consent. There is perhaps no greater usurpation of fundamental constitutional rights than forcibly injecting a foreign substance into an American citizen. The rights of our nation's most heinous convicted serial killers who have been sentenced to death receive more respect than this–and often times, even while already strapped to the chair.

34.     The aforementioned violations of Plaintiffs fundamental rights originate from are three government directives: (1) a DoD Memo issued by Secretary of Defense Lloyd Austin on August 24, 2021; (2) Executive Order 14042, signed by President Biden on September 9, 2021; and (3) Executive Order 14043, signed by President Biden on September 9, 2021. Each will be addressed in turn.

## B.     DEPT. OF DEFENSE MEMORANDUM, DATED AUGUST 23, 2021

35.     On August 24, 2021, Secretary Austin issued a "Memorandum for Senior Pentagon Leadership Commanders of the Combatant Commands Defense Agency and DoD Field Activity Directors" concerning the "Mandatory Coronavirus Disease 2019 Vaccination of

Department of Defense Service Members" ("DoD Memo").[12]

36.     The DoD Memo:

Direct[s] the Secretaries of the Military Departments to **immediately begin full vaccination of all members of the Armed Forces** under DoD authority on active duty or in the Ready Reserve, including the National Guard, who are not fully vaccinated against COVID-19", *id.*, and further "instructs the Secretaries of the Military Departments to **impose ambitious timelines for implementation**."

37.     Secretary Austin also expressly orders that "[m]andatory vaccination against COVID-19 **will only use COVID-19 vaccines that receive full licensure from the Food and Drug Administration (FDA), in accordance with FDA-approved labeling and guidance**." *Id.*

38.     This imposes an obvious "catch 22". On one hand, if Secretaries "begin full vaccination of all members of the Armed Services", such actions constitute a direct violation of Secretary Austin's order requiring the exclusive use of COVID-19 vaccines that are <u>fully licensed by the FDA</u>. Alternatively, should the Secretaries refuse to begin fully vaccinating our service members, such refusal would constitute a violation of Secretary Austin's order to "immediately begin full vaccination of all members of the Armed Force . . . [under] ambitious timelines."

39.     Despite the facially defective nature of the DoD Memo, all branches of our Armed Forces have begun requiring all active-duty service members to be vaccinated—and the timelines are certainly ambitious:

| SERVICE BRANCH | VACCINATION DEADLINE |
|---|---|
| U.S. Army | December 15, 2021 |
| U.S. Army Reserve/Nat'l Guard | June 30, 2022 |
| U.S. Navy | November 28, 2021 |
| U.S. Navy Reserve | December 28, 2021 |
| U.S. Marines Corps | November 28, 2021 |
| U.S. Marines Reserve | December 28, 2021 |
| U.S. Air Force | November 2, 2021 |
| U.S. Air Force National Guard | December 2, 2021 |

---

[12] *See*, <u>Exhibit 1</u>.

| | |
|---|---|
| U.S. Space Force | November 2, 2021 |
| U.S. Space Force Reserve | December 2, 2021 |
| U.S. Coast Guard | *as soon as operations allow* |
| U.S. Coast Guard Reserve | *as soon as operations allow* |

40.     In reality, each of the above-deadlines are actually two (2) weeks earlier as the DoD Memo states "[s]ervice members are considered fully vaccinated two weeks after completing the second dose of a two-dose COVID-19 vaccine or two weeks after receiving a single dose of a one-dose vaccine [and] [t]hose with previous COVID-19 infection are not considered fully vaccinated."

41.     Secretary Austin knew or should have known that the August 24 DoD Memo violated 21 U.S.C. § 360bbb-3 on its face by compelling vaccinations despite the non-existence of an FDA-approved vaccine.

42.     To the extent that the "ambitious timelines" for obtaining absolute vaccination of all active duty service members somehow account for the non-existence of a FDA-fully-approved vaccine, the deadlines imposed on each respective service branch by the Secretaries of the Military Departments certainly violate 21 U.S.C. § 360bbb-3 by imposing a timeline despite having no evidence, indication, or even an estimate as to when an FDA-approved vaccine will be made available for the entirety of the active duty service member population.

## C.     EXECUTIVE ORDER NO.'S 14042 & 14043.

43.     On September 9, 2021, President Biden signed two Executive Orders: E.O. 14042, which pertains to the mandatory vaccination of federal contractors and E.O. 14043, which compels the mandatory vaccination of federal employees (collectively, "Executive Orders").

44.     E.O. 14042 states "**parties that contract with the Federal Government** provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument as described in section 5(a) of this

14

order." Section 5(a) specifically states that E.O. 14043 applies to "any new contract; new contract-like instrument; new solicitation for a contract or contract-like instrument; extension or renewal of an existing contract or contract-like instrument; and exercise of an option on an existing contract or contract-like instrument," if:

    (i)    it is a procurement contract or contract-like instrument for services, construction, or a leasehold interest in real property;

    (ii)    it is a contract or contract-like instrument for services covered by the Service Contract Act, 41 U.S.C. 6701 *et seq*.;

    (iii)    it is a contract or contract-like instrument for concessions, including any concessions contract excluded by Department of Labor regulations at 29 CFR 4.133(b); or

    (iv)    it is a contract or contract-like instrument entered into with the Federal Government in connection with Federal property or lands and related to offering services for Federal employees, their dependents, or the general public;

45.    The only exclusions as to the applicability of E.O. 14043 are:

    (i)    grants;

    (ii)    contracts, contract-like instruments, or agreements with Indian Tribes under the Indian Self-Determination and Education Assistance Act (Public Law 93-638), as amended;

    (iii)    contracts or subcontracts whose value is equal to or less than the simplified acquisition threshold, as that term is defined in section 2.101 of the Federal Acquisition Regulation;

    (iv)    employees who perform work outside the United States or its outlying areas, as those terms are defined in section 2.101 of the Federal Acquisition Regulation; or

    (iv)    subcontracts solely for the provision of products.

46.    To promulgate E.O 14042:

    (i)    "Executive departments . . . shall, **to the extent permitted by law**, ensure that contracts and contract-like instruments (as described in section 5(a) of

this order) include a clause that the contractor and any subcontractors (at any tier) shall incorporate into lower-tier subcontracts.

(ii)     The Federal Acquisition Regulatory Council, **to the extent permitted by law**, shall amend the Federal Acquisition Regulation to provide for inclusion in Federal procurement solicitations and contracts subject to this order the clause described in section 2(a) of this order, and shall, by October 8, 2021, take initial steps to implement appropriate policy direction to acquisition offices for use of the clause by recommending that agencies exercise their authority under subpart 1.4 of the Federal Acquisition Regulation.

(iii)    By October 8, 2021, agencies shall take steps, **to the extent permitted by law**, to exercise any applicable authority to ensure that contracts and contract-like instruments as described in section 5(a) of this order that are not subject to the Federal Acquisition Regulation and that are entered into on or after October 15, 2021, consistent with the effective date of such agency action, include the clause described in section 2(a) of this order.

(iv)    For all existing contracts and contract-like instruments, solicitations issued between the date of this order and the effective dates set forth in this section, and contracts and contract-like instruments entered into between the date of this order and the effective dates set forth in this section, agencies are strongly encouraged, **to the extent permitted by law**, to ensure that the safety protocols required under those contracts and contract- like instruments are consistent with the requirements specified in section 2 of this order.

47.     E.O. 14043 states "it is necessary to require COVID-19 vaccination for **all Federal employees**, **subject to such exceptions as required by law**."

48.     Executive Order No.'s 14042 and E.O. 14043 (collectively, "Executive Orders") provide limitations "as required by law." Thus, whereas the Executive Orders demand a course of conduct that, if taken, would constitute a violation of a federal statute, engaging in such conduct is unlawful pursuant to the Supremacy Clause, and secondly the express language of the Executive Orders explicitly state vaccination mandates would only take effect **to the extent permitted by law.** Because the U.S. Constitution and numerous federal laws make it unlawful to compel persons to be vaccinated under E.O. 14042 and E.O. 14043, injunctive relief is proper.

**D.     THE FREE EXERCISE CLAUSE & RELIGIOUS EXEMPTIONS**

49.     The Free Exercise Clause misc.  so long as the practice does not run afoul of public morals or a compelling governmental interest. In other words, strict scrutiny applies and in order for a religious exemption to be denied–including religious exemptions based upon the practice of religion as *the applicant* pleases–the government must be able to show that the Vaccine Mandates are the "least restrictive means necessary."

50.     Fundamental to the Christian faith is a teaching that requires Christians to refuse a medical intervention, including a vaccination, if his or her informed conscience comes to this sure judgment. While the Christian faith does not prohibit medical procedures and in fact, generally encourages the use of safe and effective medical intervention as a means to both, safeguard individuals and further mitigate any public health exposures, this is the general rule–it is not absolute.

51.     The following authoritative Church teachings demonstrate the principled religious basis on which a Christian may determine that he or she ought to refuse certain vaccines:

   i.   vaccination is not morally obligatory in principle and so must be voluntary;

   ii.  there is a general moral duty to refuse the use of medical products, including certain vaccines, that are produced using human cells lines derived from direct abortions. It is permissible to use such vaccines only under certain case-specific conditions, based on a judgment of conscience;

   iii. A person's informed judgments about the proportionality of medical interventions are to be respected unless they contradict authoritative Christian moral teachings;

   iv.  A person is morally required to obey his or her sure conscience; and

   v.   Abortion is a sin and contrary to the teachings of the Christian Church. As a result, a Christian may invoke Church teaching to refuse a vaccine developed or produced using abortion-derived cell lines.

52.     More generally, a Christian might refuse a vaccine based on the Church's teachings concerning therapeutic proportionality. Therapeutic proportionality is an assessment of whether the benefits of a medical intervention outweigh the undesirable side-effects and burdens in light of the integral good of the person, including spiritual, psychological, and bodily goods. It can also extend to the good of others and the common good, which likewise entail spiritual and moral dimensions and are not reducible to public health. The judgment of therapeutic proportionality must be made by the person who is the potential recipient of the intervention in the concrete circumstances, not by public health authorities or by other individuals who might judge differently in their own situations.

53.     Another basis is the fundamental Christian belief that life is sacred. There is no doubt that fetal tissues were integral to the development of the Pfizer-BioNTech COVID-19 vaccine ("vaccine"). In the early development of the vaccine, a fetal cell line was used to test that the active ingredient, messenger RNA, worked as intended. The tests showed that messenger RNA, when introduced into human cells, produces the viral protein that makes us develop immunity against the virus that causes COVID-19. But-for the use of fetal tissue, the vaccine would not exist.

54.     Moreover, there is evidence, as a matter of law, that bioprocurement companies have, in fact, sold fetal tissue in violation of federal law and as a result, I cannot in good moral conscience, risk engaging in a practice that relates to an industry where fetal tissue has been monetized. On July 15, 2015, the United States House of Representatives Energy and Commerce Committee and House Judiciary Committee opened investigations into illegal fetal tissue procurement practices.[13]   On August 14, 2015, the House Oversight and Government Reform

---

[13] Press Release, House Energy and Commerce Committee, Energy and Commerce Committee Launches Investigation Following "Abhorrent" Planned Parenthood Video (Jul. 15, 2015); Press Release, House Jud. Committee, Chairman Goodlatte Announces House judiciary Committee Investigation into Horrific Abortion Practices (Jul. 15, 2015).

Committee initiated a third investigation.[14]  On October 7, 2015, and as a means to consolidate the three House investigations into one, the House created a Select Investigative Panel within the Energy and Commerce Committee.[15]  The Senate Judiciary Committee also initiated its own investigation, which it conducted contemporaneously and independent of the consolidated House investigation.[16]

55.     The two Congressional investigations concluded in December 2016[17] after both, the House and Senate independently concluded that many actors within the abortion industry had committed systemic violations of the law.[18]  Due to these findings, the House Select Investigative Panel and Senate Judiciary Committee issued numerous criminal and regulatory referrals to federal, state, and local law enforcement entities, including for several abortion providers and fetal tissue procurement companies.

56.     In December 2016, the Texas Health and Human Services Division ("Texas HHS") issued a Final Notice of Termination to Planned Parenthood Gulf Coast ("PP-Gulf Coast") based in Houston that terminated its enrollment in the Texas Medicaid program. According to Texas HHS, the termination was based on two factors: (1) footage of CMP's visit to the PP-Gulf Coast clinic revealing that PP-Houston would modify procedures in order to sell tissue; and (2) the U.S. House investigation's conclusion that PP-Houston had repeatedly lied to it.[19]

---

[14] Letter from Jason Chaffetz, Chariman, Committee on Oversight and Government Reform, *et al*., to Cecile Richards, President, Planned Parenthood Federation of America, Inc. (Aug. 14, 2015).

[15] [15]Wesley Lowery & Mike DeBonis, *Boehner: There will be no government shutdown; select committee will probe Planned Parenthood*, WASHINGTON POST (Sep. 27, 2015), https://wapo.st/2QxxdDR.

[16] *Id.*

[17] *Id.*

[18] [18] Select Investigative Panel of the Energy & Commerce Committee, FINAL REPORT (Dec. 30, 2016); Majority Staff Of S. Comm. On The Judiciary, 114TH CONG., Human Fetal Tissue Research: Context And Controversy, S. DOC. NO. 114-27 (2d Sess. 2016).

[19] Letter from Stuart W. Bowen, Jr., Inspector General, Texas Health & Human Services Commission, to Planned Parenthood Gulf Coast, et al. (Dec. 20, 2016).

57.     In October 2016, the Orange County, California, District Attorney initiated a civil prosecution against DV Biologics and DaVinci Biosciences for illegally re-selling fetal tissue the companies obtained from Planned Parenthood of Orange and San Bernardino Counties ("PP-Orange").[20]  The successful prosecution resulted in a stipulated judgment in which both companies admitted to selling fetal body parts obtained from PP-Orange for profit. The parties also agreed to pay $7.8 million for violating state and federal laws.[21]

58.     In January 2017, the Attorney General of Arizona initiated a civil prosecution against abortion provider, Jackrabbit Family Medicine, P.C. ("Camelback Family Planning") for illegally transferring fetal tissue to StemExpress, LLC, a California-based bioprocurement company.[22] The prosecution was successful, and the Arizona Attorney General determined that the consent formed used by StemExpress were deficient because:

> The consent forms did not state certain facts regarding StemExpress's business. . . . The consent forms [] did not state that, under the agreement [Camelback Family Planning] had entered into with StemExpress in addition to supplying the collection tubes and paying the costs of shipping the samples to StemExpress, StemExpress would pay [Camelback Family Planning] set amounts from $75–250 for each blood and tissue sample provided. [23]

59.     As part of the settlement, Camelback Family Planning was required to return all payments received it received from StemExpress and agree it would refrain from selling fetal tissue in the future.[24] Camelback Family Planning ultimately returned the money it received from StemExpress in exchange for *inter alia* fetal tissues.[25]

---

[20] *See* Complaint, *The People of the State of California v. DV Biologics, LLC*, Orange Cnty. No. 30-2016-00880665-CU-BT-CJC (Cal. Super., Oct. 11, 2016).
[21] *See* Judgment, *The People of the State of California v. DV Biologics, LLC*, Orange Cnty. No. 30-2016-00880665-CU-BT-CJC (Cal. Super., Dec. 19, 2017).
[22] *See* Complaint, *State of Arizona v. Jackrabbit Family Medicine, P.C.*, Maricopa Cnty. No. CV2017-000863 (Ariz. Super., Jan. 19, 2017).
[23] *See* Assurance of Discontinuance, *State of Arizona v. Jackrabbit Family Medicine, P.C.*, Maricopa Cnty. No. CV2017-000863 (Ariz. Super., Jan. 19, 2017).
[24] *Id.*
[25] *Id.*

60.     In short, fetal tissue has a long history of being procured and sold and it is not subject to dispute that HEK-293 and PEK.C6 fetal cell lines were used in the development and testing of the COVID-19 vaccines. Fetal tissue and bioprocurement, as evidenced above, flourish (lawfully or in the instances articulated herein, unlawfully) and continue to be sold and used in the development of vaccines. Because of this and as a Christian, I cannot engage, support, or morally receive the vaccine in good conscience.

61.     At the core of the Church's teaching are the first and last points listed above: vaccination is not a universal obligation, and a person must obey the judgment of his or her own informed and certain conscience. In fact, the Christian Church instructs that following one's conscience is following Christ Himself.

62.     Therefore, if a Christian comes to an informed and sure judgment in conscience that he or she should not receive a vaccine, then the Christian faith requires that the person follow this certain judgment of conscience and refuse the vaccine. The Church is clear: "Man has the right to act in conscience and in freedom so as personally to make moral decisions. 'He must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especially in religious matters'."

E.     **VACCINES, MEDICAL CONDITIONS, RISKS, & NATURAL IMMUNITY**

63.     The CDC has explained that even with protective measures, "most of the U.S. population will be exposed to this virus [SARS-CoV-2]."[26] Peer reviewed studies on COVID-19 demonstrate the durability of natural immunity following COVID-19 infection. The scientific evidence is clear that COVID-19 recovered individuals have immunity that is far superior to vaccine-mediated immunity. CDC and FDA data also shows that natural immunity has proved far

---

[26] https://stacks.cdc.gov/view/cdc/86068/cdc_86068_DS1.pdf.

more than 99% effective while vaccine immunity is at best between 67% and 95% effective, depending on the vaccine, and this is under the previous ideal conditions of a clinical trial. Moreover, unlike those vaccinated for COVID-19 who can still become infected and have the same amount of virus in their nose as those unvaccinated and infected with COVID-19, there has never been a single documented case of a naturally immune individual becoming re-infected with and transmitting the virus to anyone.

64.     The human body knows how to develop immunity to new viruses. The adaptive immune system consists of an enormously diverse repertoire of B cells – precursors of antibody-secreting plasma cells – and T cells with a nearly unlimited capacity to recognize and 'adapt' to previously unseen pathogens.

65.     CDC and FDA data also shows that natural immunity has proved far more than 99% effective while vaccine immunity is at best between 67% and 95% effective, depending on the vaccine, and this is under the previous ideal conditions of a clinical trial. Moreover, unlike those vaccinated for COVID-19 who can still become infected and have the same amount of virus in their nose as those unvaccinated and infected with COVID-19, there has never been a single documented case of a naturally immune individual becoming re-infected with and transmitting the virus to anyone.

66.     This means that approximately half of the individuals subject to the Vaccine Mandates Mandate are likely to have already had the virus and have natural immunity and, as discussed herein, have a lower risk than vaccinated individuals of being re-infected with and transmitting the virus.

> a:  **Naturally Acquired Immunity Provides Greater Protection than Vaccines**
>
> > i:  *Naturally Acquired Immunity is More than 99% Effective*

67.    The hunt for re-infections has been a nationwide effort and out of the estimated 120.2 million individuals in the United States who have been infected with SARS-CoV-2 as of May 2021,[27] there is not a single documented case of an individual being re-infected with the virus and transmitting it to another person.

68.    A five-month study looking at reinfection rates in employees of the Cleveland Clinic Health System previously infected with the COVID-19 virus found that not one of the 1,359 previously infected subjects who remained unvaccinated was reinfected with the virus despite a high background rate of COVID-19 in the hospital. Irish researchers recently published a review of eleven cohort studies with over 600,000 total recovered COVID-19 patients, not all of whom were well defined and may have had suspected COVID-19 with positive serologies later on who were followed up with over ten months. They found the reinfection rate to be 0.27% "with no study reporting an increase in the risk of reinfection over time." Based on this data, the researchers were able to assert that "naturally acquired SARS-CoV-2 immunity does not wane for at least 10 months post-infection." Moreover, this study also did not document a single case of reinfection that then resulted in transmission to another person.

69.    Given that the current number of confirmed cases worldwide is approximately 200 million,[28] if reinfection was possible in even one percent of individuals, the world would have observed 2 million second and third cases with many requiring hospitalizations and coming to clinical attention. No such large volume of reinfection cases has come to clinical attention in any region of the world.

ii:  *Vaccine Immunity Efficacy is Substantially Less than 99% Effective*

---

[27] *See* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/burden.html.
[28] *See* https://covid19.who.int/.

70.     In contrast to greater than 99% efficacy from natural immunity, the efficacy from vaccine immunity in a clinical trial setting is admittedly no greater than between 67% and 95%, depending on the COVID-19 vaccine. The non-FDA approved BioNTech vaccine had initially, at best, efficacy of 95%,[29] and that was under previous ideal conditions in a clinical trial, against the original wild-type variant of the virus. The COVID-19 vaccines have had considerably less efficacy in the real world which has been the case based on the data to date. But even assuming the optimal clinical trial efficacy numbers, this is still far less than the efficacy from having had the COVID-19 virus, which is over 99%.

71.     Vaccines, by design, attempt to emulate the immunity created by a natural infection. Nonetheless, they have never achieved the same level of protection afforded by natural infection from a virus. Every single vaccine for a virus confers an inferior immunity to having had the actual virus. Even the best vaccines do not confer immunity to all recipients.[30] In those who do obtain some immunity from vaccination, the temporary immunity created by any vaccine typically wanes over time. Hence, the warning in the Vaccine Mandate that COVID-19 boosters will be needed.[31] This has been confirmed by the pharmaceutical companies selling the COVID-19 vaccines and the CDC has echoed the likely need for boosters of the COVID-19 vaccines, as discussed at its advisory committee meeting on June 23, 2021.[32]

72.     Reflecting the foregoing, in an outbreak of COVID-19 among gold mine workers in French Guiana, 60% of the fully vaccinated gold mine workers were infected while none of the

---

[29] *See* https://www.fda.gov/media/144416/download.

[30] Pfizer Recipient Fact Sheet can be viewed at https://www.fda.gov/media/144414/download ("The Pfizer-BioNTech COVID-19 Vaccine may not protect everyone").

[31] *See* https://policy.ucop.edu/doc/5000695/SARS-Cov-2 at FAQ No. 4 which states, "Infectious disease experts anticipate that annual or more frequent boosters will be necessary, and receipt of boosters will be required, consistent with product labeling, in the same way that the initial vaccination is required by this policy and subject to the same Exceptions and Deferrals."

[32] *See* https://www.cdc.gov/vaccines/acip/meetings/downloads/slides-2021-06/06-COVID-Oliver-508.pdf; *see also*, *e.g.*, https://www.nytimes.com/2021/04/16/world/pfizervaccine-booster.html.

individuals with a prior COVID-19 infection were infected. Studies analyzing the entire population of Israel has found that those with prior natural infection had a higher rate of protection from infection, hospitalization, and severe illness than those that had immunity from the COVID-19 vaccine. Another report from Israel found a sixfold rate of COVID-19 infection among the vaccinated versus the naturally immune:

> With a total of 835,792 Israelis known to have recovered from the virus, the 72 instances of reinfection amount to 0.0086% of people who were already infected with COVID. By contrast, Israelis who were vaccinated were 6.72 times more likely to get infected after the shot than after natural infection.

73. Nationwide we are seeing the number of COVID-19 cases in fully vaccinated individuals is rising precipitously. That number was growing so rapidly and burdening resources to such an extent that the CDC changed its reporting criteria to only report breakthrough cases resulting in hospitalization or death.

74. But simply taking the FDA and CDC data at face value, the reality is that natural infection provides for greater than 99% protection while vaccine immunity provides for, at best, between 67% and 95% protection.

### b. COVID-19 Vaccines Do Not Prevent Infection or Transmission

75. Natural immunity confers an additional benefit over vaccine immunity. Natural immunity will prevent a virus from being able to replicate and shed in the naturally immune individual. In contrast, COVID-19 vaccines appear to reduce symptoms in some but still permit the vaccinees to become infected with and transmit the virus.[33]

76. Viral carriage by the vaccinated is reflected in the recent outbreak in Barnstable County, Massachusetts, which has a 69% vaccination coverage rate among its eligible

---

[33] *See* https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html ("There is some evidence that vaccination may make illness less severe for those who are vaccinated and still get sick.").

residents.[34] A recent CDC investigation found that 74% of those infected in the outbreak were fully vaccinated for COVID-19 and, even more alarming, the vaccinated had on average more virus in their nose than the unvaccinated that were infected. The study reported zero cases of infection among those that previously had COVID-19.

77.     This forced the Director of the CDC, Rochelle Walensky, to admit that individuals vaccinated for COVID-19, while having less symptoms, can still become infected with and transmit the virus.[35] Dr. Walensky admitted that "**what [the COVID- 19 vaccines] can't do anymore is prevent transmission**."[36] After this admission, Wolf Blitzer asks Dr. Walensky if "you get covid, you're fully vaccinated, but you are totally asymptomatic, you can still pass on the virus to someone else, is that right?" and Dr. Walensky answers "**that is exactly right**."[37]

78.     Despite this, Defendants arbitrarily allow Plaintiffs and other service members, federal employees, and federal contractors are permitted to serve or work without limitation, so long as they are "fully vaccinated" – a status incontrovertibly has been statistically and medically proven to be irrelevant as to the prevention of COVID-19 infection and subsequent transmission. On the other hand, Plaintiffs and other service members, federal employees, and federal contractors who have natural immunity have faced and continue to face adverse employment action, including without limitation, reprimand, termination, and dishonorable discharge.

   **c.   <u>Naturally Immune Vaccine Recipients are at Increased Risks</u>**

79.     Studies have demonstrated the BioNTech vaccine poses legitimate safety concerns for all recipients, but those with acquired natural immunity are at even greater risks.

---

[34] See https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm.
[35] *See* https://twitter.com/CNNSitRoom/status/1423422301882748929.
[36] *Id.*
[37] *Id.*

80.     Based on all available data to date, individuals who possess natural immunity are at virtually zero risk of becoming reinfected with and transmitting SARS-CoV-2. Johns Hopkins School of Medicine professor, Marty Makary, M.D., MPDH, has stated that the government's failure to lift the restrictions that have been imposed on naturally immune individuals is "one of the biggest failures of our current medical leadership."[38]

81.     Evidence also suggests the legitimate safety concerns posed by the BioNTech vaccine are exacerbated when the non-FDA-approved product is administered to those who have obtained natural immunity. Date shows that who have developed natural immunity experience adverse reactions when receiving the BioNTech vaccine at significantly higher rates than those who receive the vaccine and are not naturally immune.

82.     For example, Raw, *et al*. reported that among 974 individuals vaccinated for COVID-19, the vaccinated COVID-19 recovered patients had higher rates of vaccine reactions. Mathioudakis, et al. found the same result in a study of 2,002 individuals vaccinated for COVID-19. Krammer et al. found the same result in a study of 231 volunteers vaccinated for COVID- 19, concluding that, "Vaccine recipients with preexisting immunity experience systemic side effects with a significantly higher frequency than antibody naïve vaccines." In a paper published by Bruno, et al. the authors pose urgent questions on COVID-19 vaccine safety, highlighting the high number of reported serious adverse events and the shortcomings of the clinical trials, including the exclusion of those with prior SARS- CoV-2 infection.

   **d.   The BioNTech Vaccine Poses Health Risks to Every Recipient**

83.     There are also risks to receiving COVID-19 vaccines irrespective of prior infection. The primary system for tracking adverse events after vaccination in the United States is the

---

[38] *See* https://summit.news/2021/05/26/johns-hopkins-prof-half-of-americans-have-naturalimmunity-dismissing-it-is-biggest-failure-of-medical-leadership/.

Vaccine Adverse Events Reporting System ("**VAERS**"). A three-year federal government funded study by Harvard researchers tracking 715,000 patients found that "fewer than 1% of vaccine adverse events are reported."

84.    Reports of serious adverse events from COVID-19 vaccines are similarly underreported to VAERS. For example, according to the CDC, "Anaphylaxis after COVID-19 vaccination is rare and occurred in approximately 2 to 5 people per million vaccinated in the United States based on events reported to VAERS." This is in stark contrast to a recent study at Mass General Brigham that assessed anaphylaxis in a clinical setting after the administration of COVID-19 vaccines and found "severe reactions consistent with anaphylaxis occurred at a rate of 2.47 per 10,000 vaccinations." This is equivalent to 50 to 120 times more cases than what VAERS and the CDC are reporting. And this is for a serious, potentially life-threatening, adverse event that occurs almost immediately after vaccination and which vaccine providers are repeatedly advised to watch for and report.

85.    If anaphylaxis is being underreported, the level of underreporting for serious adverse events that do not occur immediately after vaccination or are not easily identified is likely far greater. For example, on June 23, 2021, the CDC reported the alarming numbers of reported myocarditis and pericarditis cases occurring after COVID-19 vaccination.23 The long-term effects of myocarditis are not fully understood but can be very serious. Cases of thrombocytopenia have also occurred after COVID-19 vaccination, as well as serious and sometimes fatal blood clots.24 These and numerous other serious adverse events are being recognized but the true rate of these serious adverse events is most certainly underreported.

86.    Even if the risks from the COVID-19 vaccines are truly small, there is no reason to expose someone to any risk when they are already immune to COVID-19.

## FIRST CLAIM FOR RELIEF
### VIOLATION OF SUBSTANTIVE DUE PROCESS
### *Against All Defendants*

87.     Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

88.     In April, Speaker of the House, Nancy Pelosi, stated:

> **We cannot require someone to be vaccinated. It's just not something we can do. It is a matter of privacy to know who is or who isn't.**

89.     Speaker Pelosi is correct. Plaintiffs, as do all other Americans, have a fundamental right to privacy.

90.     The liberty protected by the Due Process Clause of the Fifth Amendment includes not only the privileges and rights expressly enumerated by the Constitution and Bill of Rights, but also includes the fundamental rights implicit in the concept of ordered liberty.

91.     The Fifth Amendment's Due Process Clause also applies to the United States Armed Forces, including Plaintiffs and all active-duty service members.

92.     Plaintiffs also have a fundamental liberty interest and right to bodily integrity and informed consent; the latter of which is also statutorily provided. *See* 21 U.S.C. § 360bbb-3 *et seq.*

93.     The right to bodily integrity includes the concept that a "competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *See Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 277-78 (1990).

94.     The Vaccine Mandates, by requiring persons to inject into their bodies a foreign substance, unquestionably give rise to questions concerning privacy and bodily integrity; both rights of which are fundamental.

95.     The Vaccine Mandates require Plaintiffs to inject their bodies with a foreign substance or product.

96.     The Vaccine Mandates place a burden on Plaintiffs fundamental rights.

97.     The Vaccine Mandates are therefore subject to strict scrutiny. *Washington v. Glucksberg*, 521 U.S. 702 (1997).

98.     To survive strict scrutiny, the Vaccine Mandates must be (1) narrowly tailored; to (2) serve a compelling governmental interest. *Id.*

99.     "Narrowly tailored" is defined as "the least restrictive means necessary." *Shelton v. Tucker*, 364 U.S. 479 (1960).

100.    Defendants assert that the Vaccine Mandates serve the compelling governmental interest of preserving the public health and the health of our Armed Forces.

101.    The Vaccine Mandates do not serve the compelling governmental interest of preserving public health because vaccination has been, and continues to be, a direct and proximate cause of death, permanent injury, life-threatening injury, and other losses of life or damages thereto.

102.    The Vaccine Mandates, to the extent they do not cause death or injury, do not serve the compelling governmental interest of preserving public health because persons have contracted, and continue to contract, COVID-19 despite vaccination.

103.    To the extent the Vaccine Mandates do satisfy the interest of preserving the public health, the Vaccine Mandates are not narrowly tailored because the Vaccine Mandates are not "the least restrictive means necessary."

104.    Defendants contend that preserving "public health" is satisfied through the vaccination of persons against COVID-19.

105.   "Vaccination" is defined as "the act of introducing a vaccine into the body to produce protection from a specific disease."

106.   Vaccination is not "least restrictive means necessary."

107.   "Necessary" means "absolutely needed."[39]

108.   The Vaccine Mandates are not "necessary" because "the act of introducing a vaccine" is not "absolutely needed" to "produce protection" from a specific disease.

109.   Antibodies acquired through prior infection provide protection against COVID-19.

110.   Natural acquisition can replace "the act of introducing a vaccine" because the objective Defendants contend "introducing a vaccine into the body" effectuates is the "produc[tion] of protection" against COVID-19.

111.   Numerous less restrictive means than vaccination exist that serve the interest of protecting the public health against COVID-19.

112.   Safer less restrictive means than vaccination exist that serve the interest of protecting the public health against COVID-19.

113.   Persons immune to COVID-19 have no need to be vaccinated.

114.   As a result of Defendants' policies, practices, regulations, and conduct Plaintiffs have suffered, or imminently will suffer, harm, including stigma, humiliation and/or emotional distress, loss of liberty, loss of salary and benefits on which they and their dependents rely, loss of access to medically necessary care, disruption of their military service (including loss of promotion and other career opportunities), disruption of their public service (including loss of promotion and other career opportunities), and violations of their constitutional right to substantive due process.

---

[39] "Necessary", *In: Merriam-Webster.com dictionary*, MERRIAM-WEBSTER 11ᵀᴴ ED. (2003), available at: https://www.merriam-webster.com/dictionary/necessary (last accessed Sept. 22, 2021).

115.     Defendants' conduct continues to violate the substantive due process rights of Plaintiffs on a daily basis and is the proximate cause of widespread harm among Plaintiffs.

116.     As a direct and proximate result of Secretary Austin's August 24, 2021, Order and E.O. 14043, the Federal Employee Plaintiffs and respective Federal Employee Class and Subclass Members have suffered, and will continue to suffer, irreparable harm and their rights will be continued to be violated absent the injunctive relief requested.

## SECOND CLAIM FOR RELIEF
### VIOLATION OF EQUAL PROTECTION
#### *Against All Defendants*

117.     Plaintiffs re-allege and incorporate by reference as if fully set forth herein the allegations in all preceding paragraphs.

118.     The Vaccine Mandates require Plaintiffs and all other active-duty service members, federal employees, and federal contractors to obtain vaccination against COVID-19.

119.     The Vaccine Mandates, either implicitly or expressly, state that exceptions will be made for those who are subject to the order but are exempt based on closely-held religious beliefs or the professional opinions of licensed physicians.

120.     While the Vaccine Mandates appear to be facially neutral and in compliance with well-established legal principles, their application and the manner in which the Vaccine Mandates are being promulgated deny Plaintiffs and other active-duty service members, federal employees, and federal contractors of Equal Protection.

121.     The Vaccine Mandates deny Plaintiffs, and all other service members, federal employees, or federal contractors who have closely-held religious beliefs that prevent their ability to get vaccinated in good conscience, good faith, or good health.

122. Plaintiffs and other service members, federal employees, and federal contractors who are religious or disabled have suffered, and continue to suffer, significant stress and psychological harm caused by this impending threat to their military service or employment.

123. Service members, federal employees, or federal contractors who are religious or disabled are also immediately injured by the stigma created by the Vaccine Mandates. Even if some religious or disabled service members, federal employees, or federal contractors are permitted to remain exempt from the Vaccine Mandate, they now serve in a military or under employment where the Commander-in-Chief or employer has announced that their service or work is unwanted and unwelcome, and that their religion is not respected, or their medical care will be withheld. Any religious or disabled service members, federal employees, or federal contractors permitted to remain in their current positions will necessarily be treated as, and experience the harms associated with, a person with second-class status.

124. Plaintiffs, including other service members, federal employees, and federal contractors who require religious accommodations or medically necessary care to treat their respective recognized disability(ies) are entitled to care on an equal basis to what is provided to service members, federal employees, or federal contractors without religious limitations, without disabilities, or with disabilities that do not preclude getting vaccinated against COVID-19.

125. The Vaccine Mandates single out Plaintiffs based upon their religion.

126. The Vaccine Mandates single out Plaintiffs based upon their medical history.

127. The Vaccine Mandates single out Plaintiffs based upon the status as the mechanism Defendants use satisfy its alleged objective in preserving the public health.

128. As a result of being singled out by Defendants, Plaintiffs have been subjected different treatment.

129.    The different treatment to which Plaintiffs are subjected is arbitrary.

130.    The different treatment to which Plaintiffs are subjected is capricious.

131.    The Vaccine Mandates discriminate against Plaintiffs and other active-duty service members, federal employees, and federal contractors because of their religion.

132.    The Vaccine Mandates discriminate against Plaintiffs and other active-duty service members, federal employees, and federal contractors because of their medical condition.

133.    The Vaccine Mandates put fundamental rights at issue and therefore, are subject to strict scrutiny.

134.    Defendants' actions of adopting, implementing, promulgating, delegating, and enforcing the Vaccine Mandates have discriminated and continue to discriminate against Plaintiffs and other service members, federal employees, and federal contractors on the basis of their religion and such actions do not survive strict scrutiny.

135.    Defendants' actions of adopting, implementing, promulgating, delegating, and enforcing the Vaccine Mandates have discriminated and continue to discriminate against Plaintiffs and other service members, federal employees, and federal contractors on the basis of their medical condition and such actions do not survive strict scrutiny.

136.    Defendants' actions of adopting, implementing, promulgating, delegating, and enforcing the Vaccine Mandates have discriminated and continue to discriminate against Plaintiffs and other service members, federal employees, and federal contractors on the basis of invidious stereotypes, irrational fears, and moral disapproval, which are not permissible bases for differential treatment under any standard of review.

137.    Plaintiffs seek declaratory and injunctive relief because they have no adequate remedy at law to prevent future injury caused by Defendants' violation of their Fifth Amendment rights to equal protection.

### THIRD CLAIM FOR RELIEF
**VIOLATION OF 21 U.S.C. § 360bbb–3,** *et seq.*
*For Declaratory & Injunctive Relief*

138.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

139.    Federal law generally prohibits anyone from introducing or delivering for introduction into interstate commerce any "new drug" or "biological product" unless and until FDA has approved the drug or product as safe and effective for its intended uses. *See, e.g.*, Food, Drug, and Cosmetic Act ("FDCA") §§ 301(a), 505(a), 21 U.S.C. §§ 331(a), 355(a); 42 U.S.C § 262(a). A vaccine is *both* a drug and a biological product. *See* FDCA § 201(g), 21 U.S.C § 321(g); 42 U.S.C. § 262(i)(1); FDCA § 564(a)(4)(C) (defining "product" to mean "a drug, device, or biological product"). However, an exception exists whereas the FDCA authorizes the FDA to issue EUAs for medical products (e.g., non-FDA-approved vaccines such as BioNTech) under certain emergency circumstances. 21 U.S.C. § 360bbb-3,

140.    Once a product receives an EUA, the product may be introduced into interstate commerce and administered to individuals despite the medical product not yet having received full-FDA approval. Such administration is only permitted "[t]o the extent practicable" given the emergency circumstances, and "as the [agency] finds necessary or appropriate to protect the public health." As a result, "[a]ppropriate" conditions are imposed on each EUA the FDA issues. *Id.* § 564(e)(1)(A).

141.    Perhaps the most critical condition imposed is ensuring all recipients have given "informed consent" prior to receiving the non-FDA-approved medical product. Under FDCA § 564(e)(1)(A)(ii)(III), recipients of a EUA-authorized medical products must "[be] informed" of *inter alia* "**the option to accept or refuse administration of the product**." *Id.*

142.    The FDCA also requires medical products that have not been fully approved by the FDA–such as the BioNTech vaccine[40]– satisfy certain conditions "to ensure that individuals to whom the product is administered are informed . . . of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." 21 U.S.C. 360bbb–3(e)(ii).

143.    Since December 2020, the FDA has issued an EUA for the BioNTech vaccine. As part of the BioNTech EUA, the FDA imposed a condition stating that all recipients must have the "option to accept or refuse" the non-FDA-approved vaccine. To effectuate this, the EUA requires all recipients to receive a Fact Sheet ("BioNTech Fact Sheet") stating: "It is your choice to receive or not receive [the vaccine]."[41]

144.    Concerning the military, Congress enacted 10 U.S.C. § 1107a as a specific condition that expressly refers to the "option to accept or refuse" the medical product; the same condition requirement that applies to the public at-large and non-military personnel set forth in FDCA § 564(e)(1)(A)(ii)(III). *See* Pub. L. No. 108-136, sec. 1603(b)(1), § 1107a, 117 Stat. at 1690. FDCA § 564(a) provides that when an EUA product is administered to members of the

---

[40] Press Release, *Pfizer and BioNTech Submit a Variation to EMA with the Data in Support of a Booster Dose of COMIRNATY®*, BIONTECH (Sept. 6, 2021), available at: https://investors.biontech.de/node/10581/pdf;

[41] FDA, Fact Sheet for Recipients and Caregivers at 5 (revised June 25, 2021), https://www.fda.gov/media/144414/download.

armed forces, "the condition described in section 564(e)(1)(A)(ii)(III)", (e.g., the "option to accept or refuse"), **is required** pursuant to § 564(e)(1)(A), (2)(A).

145.    On July 6, 2021, Acting Assistant Attorney General Dawn Johnsen ("DOJ") submitted a Memorandum Opinion to the Deputy Counsel for the President in response to the question: "Whether the 'option to accept or refuse' condition in section 564 prohibits entities from imposing such vaccination requirements while the only available vaccines for COVID-19 remain subject to EUAs."[42]

146.    The DOJ concluded that "FDCA § 564(e)(1)(A)(ii)(III) [requires] . . . potential vaccine recipients be "informed" of . . . "the option to accept or refuse administration of the product." *Id.* at 6–7. The DOJ's conclusion is also corroborated by both, the FDA and Pfizer. Specifically, Pfizer's EUA Letter, Pfizer's Fact Sheet, and the FDA's Fact Sheet, all state "that recipients 'have a choice to receive or not receive' the vaccine."

147.    Because the only FDA-approved vaccine is COMIRNATY, and in light of the fact that COMIRNATY is unavailable, the only vaccines that can conceivably be administered are non-FDA-approved vaccines only available under EUA; therefore, because such vaccines are not fully-FDA-approved, and based upon the requirements of FDCA § 564(e) *et seq.*, the DOJ's Memorandum Opinion, Pfizer's EUA Letter, Pfizer's Fact Sheet, and the FDA's Fact Sheet, it is not subject to dispute that **any recipient of the non-FDA-approved BioNTech vaccine made available exclusively under an EUA must receive the option to accept or refuse administration of the product."**

---

[42] Johnsen, D., *Whether the 'option to accept or refuse' condition in section 564 prohibits entities from imposing such vaccination requirements while the only available vaccines for COVID-19 remain subject to EUA*, DEPARTMENT OF JUSTICE (Jul. 6, 2021); https://www.justice.gov/olc/file/1415446/download.

148.     The EUA is "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704. Further, the EUA was a decision from which rights or obligations were determined and from which legal consequences (*e.g.*, vitiating Plaintiffs' **statutorily provided "option to accept or refuse administration of the product"**, FDCA § 564(e)(1)(A)(ii)(III)) flowed.

149.     Plaintiffs have no adequate or available administrative remedy.

150.     In the alternative, any effort to obtain an administrative remedy would be futile.

151.     Plaintiff has no adequate remedy at law.

152.     As a direct and proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, irreparable harm and their rights will be continued to be violated absent the injunctive relief requested.

153.     As a direct and proximate result of E.O. 14042, the Federal Contractor Plaintiffs and respective Federal Contractor Class and Subclass Members have suffered, and will continue to suffer, irreparable harm and their rights will be continued to be violated absent the injunctive relief requested.

154.     As a direct and proximate result of E.O. 14043, the Federal Employee Plaintiffs and respective Federal Employee Class and Subclass Members have suffered, and will continue to suffer, irreparable harm and their rights will be continued to be violated absent the injunctive relief requested.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT ("APA")**
*Against All Defendants*

155.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

156.    The APA directs courts to set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A).

157.    Specifically, the Vaccine Mandates are arbitrary because of reasons, including but not limited to, scientific data and studies exist that demonstrate vaccinated persons can still contract COVID-19 and that unvaccinated persons with COVID-19 antibodies also provide protection against COVID-19. The Vaccine Mandates are further arbitrary, in that the protection provided by natural immunity is up to 27x greater.

158.    Not only are the Vaccine Mandates arbitrary, but also unconstitutional and unlawful pursuant to federal statute.

159.    A person suffering legal wrong because of agency action . . . is entitled to judicial review thereof. An action . . . seeking relief other than money damages . . . shall not be dismissed . . . on the ground that it is against the United States. *See* 5 U.S.C. § 702 *et seq.*

160.     Defendants have also violated 5 U.S.C. §§ 500-706, which provides for judicial review to compel agency action if it is unreasonably delayed (§ 706 (I)), and grants judicial review to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." *Id*. at § 702.

161.    "Agency action" includes the "failure to act." *Id*. at § 551(13).

162.    When unreasonable delay occurs, courts may "compel agency action unlawfully withheld or unreasonably delayed," and "hold unlawful and set aside agency action, findings, and conclusions found to be   . . .   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. at § 706(1); 706(2)(A)

163.   The APA also requires that agencies give "prompt notice" if they deny a petition and, "[e]xcept in affirming a prior denial or when the denial is self-explanatory," give "a brief statement of the grounds for denial." *Id.* at§ 555(e).

164.   Defendants have a duty to respond timely to Plaintiffs Petition. See 5 U.S.C. § 555(b).

165.   Defendants have established firm deadlines for Plaintiffs to become fully vaccinated.

166.   Despite this, Defendants have refused and continue to refuse to provide a uniform policy as to how Plaintiffs can submit their Vaccine Mandate exemption paperwork that pertains to Plaintiffs' closely held religious beliefs or medical conditions.

167.   Given the expediency by which Defendants demand Plaintiffs get vaccinated, the delay to set forth such a policy or procedure exceeds far beyond the bounds of ordinary, reasonable response time to promulgate such a policy under the APA.

168.   Defendants' violation is ongoing. Their failure to properly regulate the submission of religious and medical exemptions allows egregious suffering to continue every day.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF RFRA, 42 U.S.C. § 2000bbb, *et seq.*,**
***Against All Defendants***

169.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

170.   The Religious Freedom Restoration Act of 1993 ("RFRA") prohibits the "Government [from] substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability" unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2)

is the least restrictive means of furthering that compelling governmental interest." 42 U. S. C. §§2000bb–1(a), (b). As amended by the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), RFRA covers "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." §2000cc–5(7)(A).

171.   Defendants, as state actors, imposed a burden on Plaintiffs' exercise of religion.

172.   The burden imposed on Plaintiffs' exercise of religious is substantial, in that the Vaccine Mandates *inter alia* effect Plaintiffs ability to: maintain employment, seek future employment, abide by the principles, beliefs, morals, values, or practices of their religion, ostracizes plaintiffs in society, discriminates against plaintiff because of their religion, and causes other economic and non-pecuniary injuries including the loss of promotional opportunity, benefits and insurance, and causes Plaintiffs to endure mental anguish and emotional distress concerning their ability to abide by their faith and further mental anguish and emotional distress related to fear of physical or mental injury that has been and continues to be directly and proximately caused by the vaccination.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.   Issue a declaratory judgment that the Vaccine Mandates violate 21 U.S.C. § 360bbb–3 by denying Plaintiffs of the opportunity to accept or refuse the non-FDA approved vaccination and are invalid on their face;

B.   Issue a declaratory judgment that the Vaccine Mandates violate the Fifth Amendment's guarantee of substantive due process and are invalid on their face;

C.      Issue a declaratory judgment that the Vaccine Mandates violate 5 U.S.C. § 706(2)(A) as the Vaccine Mandates are arbitrary or capricious and are invalid on their face;

D.      Issue a declaratory judgment that the Vaccine Mandates as applied violate Title VII of the Civil Rights Act of 1964 by discriminating against Plaintiffs and service members, federal employees, and federal contractors on the basis of their religion or disability, and are invalid on their face;

E.      Issue a declaratory judgment that the Vaccine Mandates violate the equal protection component of the Fifth Amendment to the U.S. Constitution, and are invalid on their face;

F.      Issue an Order preliminarily and permanently enjoining Defendants from enforcing the Vaccine Mandates, including ordering that:

   i.      Individual Plaintiffs and all religious or disabled service members, federal employees, and federal contractors may not be discharged, denied promotion, or otherwise receive adverse employment treatment solely on the basis of their religion or disability status;

   ii.     Individual Plaintiffs and all other religious or disabled service members, federal employees, and federal contractors may not be denied medically necessary accommodations, including the provision of exemptions; and

   iii.    Individual Plaintiffs and all other men and women with closely-held religious beliefs or a recognized disability may not be denied the opportunity to join a branch of the U.S. Armed Forces, obtain gainful employment with the federal government, or obtain gainful employment with any entity that contracts with the federal government;

G.      To the extent this Court does not grant the above-requested relief, order Defendants to promptly establish objective criterion and an objective procedure by which Plaintiffs and other service members, federal employees, and federal contractors may submit their religious or medical

exemptions expeditiously and be able to do so without fearing or receiving unjust or unlawful denials;

H.     Award reasonable attorneys' fees and allowable costs of court; and

I.     Award any further relief this Honorable Court deems just and proper.

Dated: September 22, 2021.


                              Respectfully submitted,

                       By: /S/ MICHAEL A. YODER
                           Michael A. Yoder [1600519]
                           THE LAW OFFICE OF MICHAEL A. YODER, PLLC
                           2300 Wilson Blvd., Suite 700
                           Arlington, VA 22202
                           Tel: (571) 234-5594
                           Fax: (571) 327-5554
                           michael@yoderesq.com


                       By: /S/ PATRICK R. HOLLINGSWOTYH
                           Patrick R. Hollingsworth* [CA Bar No. 264113]
                           HOLLINGSWORTH & HOLLINGSWORTH APC
                           2525 Camino del Rio S, Suite 306
                           San Diego, CA 92108
                           Tel: (619) 810-1427
                           Fax: (619) 810-1429
                           patrick@2hlaw.com
                           *Pro Hac Vice Forthcoming

                           *Counsel for Plaintiffs Gregg Costin, Daniel
                           Schultz, Cassidy Hollowell, Nathaniel Steele,
                           Zachary Amigone, Thomas Handyside,, Bogdan
                           Matuszynski, Daniel Jackson, Lionel Klein and
                           Tanya Murrieta*